Dianne M. SCHLITZER, Appellee,

v.

**UNIVERSITY OF IOWA HOSPITALS & CLINICS and State of Iowa, Appellants.**

No. 99–0735.

Supreme Court of Iowa.

Jan. 24, 2002.

Rehearing Denied April 8, 2002.

Thomas J. Miller, Attorney General, and Joanne Moeller, Assistant Attorney General, for appellants.

Martin A. Diaz of the Diaz Law Firm, Iowa City, for appellee.

LARSON, Justice.

This is an appeal by the plaintiff's former employer in a suit under the Iowa and

federal disability discrimination statutes. Because we conclude the plaintiff failed to establish a prima facie case of discrimination, we reverse and remand for dismissal of the suit.

## I. *Facts and Prior Proceedings.*

The plaintiff, Dianne Schlitzer, was employed in the bariatric and vascular surgery unit of the University of Iowa Hospitals and Clinics (UHC) in Iowa City. Many of the patients in her unit were bedridden, wheelchair-bound, amputees, or other severely disabled persons. Schlitzer stated in her brief:

This unit was made up of the morbidly obese and those patients who were vascularly compromised, often leading to amputation. As a result, the unit where [I] worked was very physically demanding.

Schlitzer was able to perform her duties without physical difficulty until December 12, 1991, when she was involved in a single-car accident in which she injured her back, neck, and left shoulder. She returned to work but continued to have problems with her injuries. Schlitzer was still receiving medical care related to her car accident when, on May 25, 1994, she reinjured her neck, back, and left shoulder while assisting a patient from a commode to a bed. She was seen in the emergency room, and her doctors advised her to stay off work for an indeterminate period.

Jan Gorman, an "accommodations specialist" for UHC, began providing accommodation services to Schlitzer on June 9, 1994. Gorman met with Schlitzer, obtained information about her condition, and discussed the need to identify permanent restrictions to determine whether Schlitzer would be able to return to work.

At the end of July 1994, Schlitzer was released to return to work with a restriction of twenty pounds lifting and limited left-arm use. However, these medical restrictions prevented her from returning to her previous position. One of her doctors indicated that a lifting limit, imposed because of her back condition, would likely become permanent. In September 1994, after a functional capacity assessment was performed, she was told to limit lifting to 7.5 pounds, no more than four times per hour, and to twenty pounds on a nonrepetitive basis.

Schlitzer had surgery on her shoulder on November 9, 1994. On March 31, 1995, she was again released to work, but with similar medical restrictions on the use of her left arm. In April 1995 the UHC assigned her a priority status for any vacancy that might become available for which she was qualified. Jan Gorman reviewed with Schlitzer the services that her office could provide. Schlitzer was to check the university's "Job Line" for vacancies, get the names of any job openings in which she was interested, and provide that information to Gorman. Schlitzer was able to access the job line either by calling a toll free number or by obtaining a hard copy at one of two University of Iowa offices. Vacancies were listed for a week or two each, and the job line was updated on a daily basis. In addition to the job line, Schlitzer had access to the *Nursing News*, an internal posting of available positions in the Department of Nursing.

Schlitzer only investigated three vacancies using the resources offered to her by the university, and she only pursued one of those vacancies to the point of interview. In July 1995 she applied for a job in the college of medicine, which was held open for her for several months. However, she withdrew from consideration from that position, ostensibly because of the on-call requirements. According to Gorman, Schlitzer "would have had that job."

Gorman heard from Schlitzer again on October 3, 1995, when Schlitzer contacted her about a vacancy in the hospital's in vitro fertilization unit (IVF). Schlitzer filled out a request for this vacancy, and the position was held open for her for over two weeks. As before, however, she withdrew from consideration for this position—this time because the position was only half-time and because she preferred to apply for a different position.

The third job for which Schlitzer expressed an interest to Gorman was the position she had referred to when she withdrew from consideration for the IVF position. This position was in a higher pay grade, and university policy dictated that Gorman was only able to request an interview for Schlitzer. Gorman made the request, and Schlitzer was interviewed for the position in November 1995 but was not hired. Gorman did not hear from Schlitzer for over three months. In December 1995 Schlitzer filed a grievance and this civil rights complaint based on what she perceived to be UHC's failure to hire her back to a vacant position.

Despite her medical condition, Schlitzer wanted the UHC to return her to work as a nurse. On March 19, 1996, she wrote a letter to Judith Ryan, the director of nursing, in which she listed those portions of a nursing position she believed she was able to perform. Schlitzer claimed to be able to perform many functions—complete bed baths, whirlpools, initiation and follow-through with emergency functions—that the department of nursing thought were neither possible nor safe, given Schlitzer's lifting restrictions. Schlitzer's letter noted that she would need assistance with lifting over twenty-five pounds and turning large patients and requested the following accommodations:

#1. A position that provides adequate staffing to assist me when turning or lifting heavy patients, or

#2. A position providing cares for ambulatory patients or infants, and

#3. I also request IV poles that allow for height adjustment.

Less than three months after writing this letter, Schlitzer was seen in the spine diagnostic center at the hospital. She told medical personnel there that "driving where she has to hold onto the steering wheel is quite difficult for her and that she is now driving short distances before taking periods of rest." Two days later, on June 7, 1996, she was seen by Dr. Hartley in the workers' health clinic where she told him that her significant back and shoulder pain "limits many of her daily activities." On July 17, 1996, Schlitzer was given her final set of medical restrictions. She was told to

observe a lifting restriction of 5 lb. above waist level, and 25 lb. to waist level (nonrepetitively, *i.e.*, four times or less per hour). She should avoid lifting with her arm outstretched. She should avoid repetitive bending and stooping.

She was also told she should not engage in sitting, standing, or walking for more than two hours without a break. No physician has imposed any new restrictions or made any changes since that time.

Although Schlitzer did not work for the university hospital after her second injury, she remained employed in the nursing field—first for a hospice, providing limited nursing care, and then with a community college in a nurse-teaching position. She was later employed in a nursing home, where she was still employed at the time of trial.

Trial was held in January 1999. The jury returned a verdict in favor of Schlitzer, and the district court entered judg-

ment in accordance with the verdict. Defendants then filed this appeal.

## II. *The Applicable Law.*

Schlitzer filed her suit under both the Federal Americans With Disabilities Act (ADA), 42 U.S.C. § 12101–213, and Iowa's civil rights statute, Iowa Code ch. 216 (1997). The common goals of the Federal ADA and our civil rights act have encouraged us to look to the federal statutory and regulatory standards in applying our statute. *Vincent v. Four M Paper Corp.,* 589 N.W.2d 55, 59–60 (Iowa 1999).

After the trial of this case to a jury and the court's judgment, the defendant requested, under Iowa Rule of Civil Procedure 179(b), that the court state whether the judgment was entered under both the federal and state statutes. (This was a relevant inquiry because the Federal Act entitles a claimant to a jury trial, while the Iowa Act does not.) The defendant inquired whether a different conclusion would follow in a case tried to the court, without a jury, as the Iowa statute requires. The court ruled that,

> [t]o the extent the court has jurisdiction to answer the questions raised, the court, acting on the State claims, reaches the same conclusions and makes the same findings as those determined [by the jury] on the Federal claims. . That is, the results of the Plaintiff's causes of action are the same in both the Federal and State claims.

After this ruling on the rule 179(b) motion, the United States Supreme Court held the federal act does not provide a cause of action for discrimination suits against *states,* reasoning that

> Congress is the final authority as to desirable public policy, but in order to authorize private individuals to recover money damages against States, there must be a pattern of discrimination by

the States which violates the Fourteenth Amendment, and the remedy imposed by Congress must be congruent and proportional to the targeted violation. Those requirements are not met here, and to uphold the Act's application to the States would allow Congress to rewrite the Fourteenth Amendment. . . .

*Bd. of Trs. of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 374, 121 S.Ct. 955, 967–68, 148 L.Ed.2d 866, 883–84 (2001). Accordingly, we apply only the Iowa Act here.

Under the Iowa civil rights statute, Iowa Code § 216.6(1),

> [i]t shall be an unfair or discriminatory practice for any:
>
> *a.* Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, national origin, religion, or *disability* of such applicant or employee, unless based upon the nature of the occupation. If a person with a disability is qualified to perform a particular occupation, by reason of training or experience, the nature of that occupation shall not be the basis for exception to the unfair or discriminating practices prohibited by this subsection.

(Emphasis added.)

■■■ Our review of a disability discrimination claim is at law, *Boelman v. Manson State Bank,* 522 N.W.2d 73, 76 (Iowa 1994), and we are bound by the court's findings of fact if supported by substantial evidence. We view the facts in the light most favorable to upholding the judgment. *Id.*

■■■ *Boelman* developed a test to be applied in cases involving an employer's

acknowledged reliance on a disability-related ground for an employment decision. That is the case we have here. A claimant in these circumstances must establish a prima facie case that (1) she has a disability, (2) she was qualified for the position sought, and (3) the employment decision was based on her disability. *See id.* at 79.

In the present case, it is undisputed that Schlitzer is "disabled" under the statute, and this disability was the basis for the defendant's hiring decision. Thus, the first and third elements of the test are satisfied. The critical issue here is whether she made a prima facie showing she was "qualified" for the position she sought. To establish this element, Schlitzer must show that she was qualified to perform the job by showing she "could perform the essential functions of [her] job with or without accommodation." *Id.* at 81–82. If an employee's ability to do her job depends on reasonable accommodation, the employee must make a facial showing that reasonable accommodation was possible. If this factual showing is made, the burden shifts to the employer to show that the suggested accommodation was unreasonable or would constitute an undue hardship. *Id.* at 82. However, as a general rule, any expense to the employer in accommodating a claimant that is more than de minimus is not required. *Courtney v. Am. Nat'l Can Co.,* 537 N.W.2d 681, 687 (Iowa 1995). In *Courtney* the claimant's vision problems prevented him from effectively operating a forklift. We held that forklift operation was such an integral part of his job that fashioning a job without forklift requirements would alter the essential nature of the job and would therefore not be an accommodation required by the civil rights statute. *Id.*

In this case, it is undisputed that Schlitzer could not perform her previous work. However, she sought accommoda-tion through reassignment to another job with the university hospital. The hospital argues that Schlitzer failed to make a prima facie case for accommodation because she did not identify a vacant position for which she was qualified. An employer is not required to create a vacancy or otherwise create a job for a claimant. *See Treanor v. MCI Telecoms. Corp.,* 200 F.3d 570, 575 (8th Cir.2000). The relevant time for determining if a vacancy exists is said to be the time of discharge or other adverse employment decision. *McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1165 (7th Cir.1997).

The relevant time for determining whether a vacancy existed in this case is complicated by the fact Schlitzer was never discharged but was allowed to stay on medical leave for over four years. The defendant suggests the relevant time here is from March 1995, when she was released to work after her surgery, and December 1995, when she filed a civil rights complaint with the civil rights commission. We believe this is an appropriate time frame for determining whether a vacancy existed, and the plaintiff has not proposed a more appropriate alternative. That is the time we will use in determining whether a vacancy existed.

### III. *Application of Law to the Facts.*

As noted the key issue is whether Schlitzer is "qualified" for a position that she has identified. She has the burden of making a prima facie case that there was a job available and that she was qualified to fill it. *See McCreary,* 132 F.3d at 1165. Schlitzer identified the type of position she thought she could handle, but she only identified three vacancies using the resources offered to her by the university, and only pursued one of those vacancies to the point of interview. UHC also contends

she was not qualified to handle the type of position she identified.

In this case the plaintiff failed to identify a specific available job she pursued, for which she was qualified, and which was denied to her because of her disability. As the court noted in *Treanor*:

> To conclude that a person is a qualified individual within the meaning of the ADA, the court must consider whether the person has "the requisite skill, experience, education and other job-related requirements of the employment position that such individual *holds or desires.*"

*Treanor*, 200 F.3d at 575 (quoting *Weber v. Strippit, Inc.*, 186 F.3d 907, 916 (8th Cir. 1999) (emphasis added by court))).

In *Treanor* a disability claimant complained that her previous employer failed to assist her in finding part-time employment as an accommodation. The court concluded MCI had no duty to "find or make" employment for her, concluding "the ADA does not require an employer to create a new part-time position where none previously existed." *Id.* Furthermore, "Treanor made no assertion that any particular suitable job was available." *Id.* The court affirmed a summary judgment for the employer, concluding that "a court cannot evaluate a plaintiff's qualifications in a vacuum but must consider the specific essential functions of a *particular* job." *Id.* at 576 (emphasis added). While Schlitzer identified types of positions she felt she could handle, she only followed through the interview process with one particular job, which was a promotion.

Schlitzer insisted at trial that she was physically capable of working as a nurse in a clinic setting providing care for ambulatory patients or infants. Although she had never worked at any of the UHC clinics, she believed clinic work would be less physically demanding than working in an inpatient unit, which she had done before.

However, UHC presented testimony at trial that, although some clinic patients are truly ambulatory, others arrive on a cart or in a wheelchair. Clinic patients may be arthritic, confused, dizzy, or light-headed, or they may have had a stroke or an amputation. They must often be helped or bodily lifted in or out of their chairs, on and off a cart, on and off examination tables, up and down steps, in and out of the bathroom, and on and off a commode.

There was testimony that clinic patients may faint or fall at any time. They undergo anesthesia, are on medications, and are subject to uncomfortable or painful procedures. They have heart attacks, stop breathing, and are often accompanied by heavy and complicated monitors or other apparatuses. They may need dressing changes, casts, x-rays, or catheterizations, all of which require that their bodies or limbs be picked up, held, or manipulated. Clinic patients undergo chemotherapy, surgery, spinal taps, and bone marrow aspirant procedures. Even a mere blood draw may cause a patient to suddenly lose consciousness. According to the testimony, nurses must be ready to provide immediate physical support for these clinic patients at any time.

Nurses sometimes work alone in the clinics, especially at the end of a day. They are often on their feet for several hours at a time without the opportunity to even sit. Clinic nurses must be able to lift and move equipment and IVs, adjust monitors, perform treatments, and do patient assessments requiring the use of both arms and hands. They must have the ability to lift, hold, pull, or push patients of any weight. The nurses uniformly testified that clinic jobs require significant physical exertion. It is clear that if Schlitzer were to be given one of these jobs it would be virtually certain that some of her

tasks would have to be performed by others.

■ Any accommodation that places the burden of a job on other employees to perform the function assigned to the claimant substantially impinges on the rights of other employees and is therefore unreasonable. *See Courtney,* 537 N.W.2d at 687; *Frank v. Am. Freight Sys., Inc.,* 398 N.W.2d 797, 803 (Iowa 1987). Disability discrimination law does not require an employer to change the "essential elements" of the job in order to accommodate a claimant. *Courtney,* 537 N.W.2d at 687.

In *Estate of Morgan v. North Star Steel Co.,* the claimant's poor vision prevented him from high climbing as required of a millwright. 530 N.W.2d 455, 457 (Iowa 1995). Morgan's proposed accommodation included installation of an elevator or the assignment of some of Morgan's responsibilities to others. We agreed with the district court that the elevator suggestion was not feasible because of space and safety concerns. Moreover, we found Morgan had failed to establish a prima facie case as to his ability to do the job because " 'accommodation must be made by an employer only if it does not impinge on the rights of other employees or incur more than a de minimus cost to the employer.' " *Id.* at 458 (quoting *Smith v. ADM Feed Corp.,* 456 N.W.2d 378, 386 (Iowa 1990)). We have said that,

> in most discrimination cases based on disability, individualized consideration must be given to the job and to the applicant's particular circumstances.... The nature and extent of a disability, the needs of a particular job, and the impact of disability on a person's ability to perform that job, are too diverse to permit generalized application.... This is implicit in our *Foods, Inc.* case, where we looked to the individualized circum-

stances of the complainant and the job. *See Foods, Inc. [v. Iowa Civil Rights Comm'n,* 318 N.W.2d 162, 166–69 (Iowa 1982)].* This would not be true in every disability case, of course, because the nature of the disability and the job might in some cases be so incompatible that generalized rules could be applied. A rule prohibiting employment of a blind person as a driver would be an obvious example.

*Frank,* 398 N.W.2d at 801. We believe that the plaintiff's disability substantially limits her ability to lift and makes a clinic nurse's job incompatible with her physical condition.

■ In this case the plaintiff failed to identify a specific available job for which she was qualified. In addition to Schlitzer's failure to identify a specific job that was available, she failed to show she was qualified for the type of position she sought. She therefore failed to establish a prima facie case under the civil rights statute. *See Boelman,* 522 N.W.2d at 81–82. We reverse and remand for dismissal of the plaintiff's petition.

**REVERSED AND REMANDED.**