CADY, Chief Justice.
In this appeal involving a lawsuit for wrongful termination of employment, we must determine whether multiple sclerosis is a disability contemplated by the Iowa Civil Rights Act of 1965 (ICRA), Iowa Code chapter 216 (2011). If so, we must also determine whether the employee was otherwise qualified to perform the essential functions of his employment as a product delivery driver who must hold a commercial driver’s license. The district court granted summary judgment for the employer. On our review, we conclude multiple sclerosis is a disability under the ICRA and that a genuine issue of material fact exists regarding whether the employee was qualified to perform the essential functions of the position. Accordingly, we reverse the district court and remand for further proceedings.
I. Background Facts and Prior Proceedings.
John Goodpaster was employed by Schwan’s Home Service, Inc. as a customer service manager. Schwan’s is the largest home delivery frozen foods company in the nation and operates sales companies from various locations around the country, including Des Moines. The Des Moines location was managed by Todd Swanson. Goodpaster began working for Schwan’s as a manager trainee and was promoted to customer service manager in August 2007. His main duty was to sell and deliver company products to customers at their homes or place of business. A basic requirement of the job was to operate a commercial vehicle and meet all require *5 ments of the U.S. Department of Transportation (DOT), including maintaining a driver’s license and medical certification to drive.
Goodpaster sought medical attention in late 2008 after suffering chest pains and loss of eyesight. He was seen by several doctors and underwent multiple medical examinations and tests, including an examination at the Mayo Clinic. A neurologist at the Mayo Clinic suspected Goodpaster had “quiescent subclinical” multiple sclerosis. A neurologist in Des Moines diagnosed Goodpaster with multiple sclerosis, although another doctor was unable to identify any symptoms of multiple sclerosis in Goodpaster. Goodpaster had other medical ailments, including fibromyalgia and hypertension.
Goodpaster continued to work despite his medical problems. Over the next one and one-half years, he would occasionally experience what he called “flare-ups” while working. During these flare-ups, which occurred between five and ten times, he would experience vision impairment and loss of control and strength in his arms and legs. Medical providers advised him to stop working and to relax until the symptoms subsided. Goodpaster had no form of medical restrictions on his work.
At times, Goodpaster asked Schwan’s to rearrange his route due to his health condition. He was accommodated on each occasion. However, on another occasion, Goodpaster asked Swanson if someone could transport him from a location on his delivery route to the company office because he felt it was unsafe for him to drive. In response, he was asked to “gut it out.” On another occasion, Goodpaster requested that Swanson make arrangements for another employee to ride with him on his route as a backup driver in the event he suffered a flare-up. This request was also denied. Goodpaster also sought a transfer to a warehouse position. He was never interviewed for an opening in the warehouse because he did not meet the requirement of having prior warehouse experience.
Goodpaster’s sales began to decrease. Over time, he became the lowest performing customer service manager at the Des Moines location. Swanson, however, had removed Goodpaster from some of his most profitable routes and assigned him to less profitable routes. Sales expectations and quotas were part of the job, and Good-paster was failing to meet the company’s expectations.
Goodpaster was given several written warnings about his failure to meet company sales expectations. After no improvement was made, Goodpaster was terminated.
Goodpaster subsequently filed a lawsuit in district court under the ICRA for disability discrimination and retaliation. He claimed he was terminated from his employment because he had multiple sclerosis. He also claimed Schwan’s failed to provide him with reasonable accommodations. Goodpaster sued both Schwan’s and Swanson.
Schwan’s and Swanson moved for summary judgment. They claimed Goodpaster could not establish a case for discrimination or retaliation as a matter of law. Among other specific grounds, Schwan’s claimed Goodpaster did not have a qualifying disability, was not qualified to perform the essential functions of the job with or without a reasonable accommodation, and had no direct or indirect evidence of discrimination. Schwan’s and Swanson also argued there was no causal connection between Goodpaster’s request for accommodations and termination of his employment to support the retaliation claim. Finally, Schwan’s and Swanson claimed Schwan’s *6 had a legitimate, common nondiscriminatory reason to terminate Goodpaster.
Goodpaster moved to compel discovery prior to submission of the summary judgment motion so he could fully resist the proceeding. The district court denied the request.
The district court granted summary judgment on all claims. Goodpaster appealed. On appeal, he claims multiple sclerosis is a disability protected under the ICRA, and his claim was sufficient to withstand summary adjudication.
II. Scope of Review.
We review a decision by the district court to grant summary judgment for correction of errors at law. See Phillips v. Covenant Clinic, 625 N.W.2d 714, 717 (Iowa 2001); see also Iowa R.App. P. 6.907. Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(8); Swartzendruber v. Schimmel, 613 N.W.2d 646, 649 (Iowa 2000). “The burden is on the moving party to demonstrate that it is entitled to judgment as a matter of law.” Sallee v. Stewart, 827 N.W.2d 128, 133 (Iowa 2013). As we determine whether the moving party has met this burden, we view the record in the light most favorable to the nonmoving party. See Wright v. Am. Cyanamid Co., 599 N.W.2d 668, 670 (Iowa 1999). “Even if facts are undisputed, summary judgment is not proper if reasonable minds could draw from them different inferences and reach different conclusions.” Walker Shoe Store, Inc. v. Howard’s Hobby Shop, 327 N.W.2d 725, 728 (Iowa 1982).
III. Discussion.
The ICRA makes it “an unfair or discriminatory practice” to discharge an employee or otherwise discriminate against an employee “because of the ... disability of such ... employee.” Iowa Code § 216.6(l)(a). To prevail on a disability discrimination claim under the ICRA, Goodpaster must initially prove a prima facie case by showing: (1) he has a disability, (2) he is qualified to perform the essential functions of the customer service manager position, and (3) the circumstances of his termination raise an inference of illegal discrimination. See Schlitzer v. Univ. of Iowa Hosp. & Clinics, 641 N.W.2d 525, 530 (Iowa 2002). We begin by considering the first element of the claim.
A. Whether Goodpaster’s Multiple Sclerosis Constitutes a Disability Under the ICRA. The Act defines a “disability” as “the physical or mental condition of a person which constitutes a substantial disability.” Id. § 216.2(5). The definition also includes the condition of a person with a positive diagnosis of human immunodeficiency virus, acquired immune deficiency syndrome, and related diagnoses, but no further legislative explanation is provided. See id.
Regulations promulgated by the Iowa Civil Rights Commission, however, do elaborate on the meaning of a disability. See Iowa Admin. Code r. 161 — 8.26 (providing definitions for various terms related to disability discrimination in employment). They provide that “[t]he term ‘substantially handicapped person’ shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.” Id., r. 161 — 8.26(l).[1] Goodpaster seizes on *7 this definition to argue that he is a disabled person under all three prongs of the definition. Because we conclude a genuine issue of material fact exists regarding the issue of actual disability, we can confine our analysis to the first prong of the definition involving the presence of an actual disability that impairs a major life activity.
The term “physical or mental impairment” means:
a. Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or
b. Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.
Id. r. 161 — 8.26(2). Additionally, “[t]he term ‘major life activities’ means functions such as earing for one’s self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.” Id. r. 161 — 8.26(3).
We have never determined whether multiple sclerosis is a disability under the ICRA, although we have assumed without comment in a past case that multiple sclerosis is a disability. See Boelman v. Manson State Bank, 522 N.W.2d 73, 77-78 (Iowa 1994). In this case, we confront the question head-on.
To begin with, multiple sclerosis fits within the broad category of a “physiological disorder or condition” that generally affects the neurological system. See id. r. 161 — 8.26(2)(a). Further, there was sufficient record evidence that Goodpaster’s multiple sclerosis limits some major life activities, like walking, during episodic flare-ups. See id. r. 161 — 8.26(3). The fighting question is whether the occasional flare-ups experienced by Goodpaster constitute a substantial limitation of a major life activity.
The phrase “substantially limits” is not defined by statute or the Iowa Administrative Code. The underlying controversy— whether Goodpaster’s multiple sclerosis is a disability under the ICRA — essentially centers on these words. Both parties rely to some extent on federal law.
Schwan’s argues multiple sclerosis is not a disability and primarily relies on a federal court case that held multiple sclerosis does not substantially limit any major life activity. Nyrop v. Indep. Sch. Dist. No. 11, 616 F.3d 728, 733-35 (8th Cir.2010). The holding in Nyrop is grounded in a pair of United States Supreme Court cases that increased the threshold inquiry in order to decide if an impairment substantially limits a major life activity under the Americans with Disabilities Act of 1990, as amended (ADA), 42 U.S.C. §§ 12101-12213.[2] First, *8 in Sutton v. United Air Lines, Inc., the Supreme Court held that whether an impairment substantially limits a major life activity “is to be determined with reference to corrective measures” such as medication or eyeglasses. 527 U.S. 471, 488, 119 S.Ct. 2139, 2149, 144 L.Ed.2d 450, 466 (1999), superseded by statute, ADA Amendments Act of 2008, Pub.L. No. 110— 325,122 Stat. 3553, as recognized in Ragusa v. Malverne Union Free Sch. Dist., 582 F.Supp.2d 326, 342 n. 5 (E.D.N.Y.2008), aff'd in part, vacated in part on other grounds, 381 Fed.Appx. 85, 90 (2d Cir. 2010). Second, in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, the Court held the phrase “substantially limits a major life activity” must be interpreted strictly, reasoning that the language “substantially” and “major” precludes minor impairments. 534 U.S. 184, 196-98, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, 630-31 (2002), superseded by statute, ADA Amendments Act of 2008, Pub.L. No. 110-325,122 Stat. 3553, as recognized in Ragusa, 582 F.Supp.2d at 341 n. 4. The Toyota Court also held:
[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people’s daily lives. The impairment’s impact must also be permanent or long term.
Id. at 198, 122 S.Ct. at 691, 151 L.Ed.2d at 631. It opined that the terms “major life activities” and “substantial limitation” “need to be interpreted strictly to create a demanding standard for qualifying as disabled.” Id. at 196, 197, 122 S.Ct. at 691, 151 L.Ed.2d at 631.
Congress amended the ADA in 2008. See ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553. The Federal Act now provides, “The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.” 42 U.S.C. § 12102(4)(A). Notably,-it specifies that “[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.” Id. § 12102(4)(D). Additionally, “[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as ... medication.” Id. § 12102(4)(E)(i)(I).
A review of the legislative history reveals Congress disfavored the Toyota and Sutton cases. Senator Tom Harkin of Iowa, the bill’s lead sponsor, chief advocate, and floor manager in the Senate, declared the bill was “rejecting several opinions of the Supreme Court that have had the effect of restricting the meaning and application of the definition of disability.” See 154 Cong. Rec. S8342-01 (daily ed. Sept. 11, 2008) (statement of Sen. Tom Harkin). Similarly, Representative George Miller of California stated the bill “revers[ed] flawed court decisions to restore the original congressional intent of the [ADA].” 154 Cong. Rec. H8286-03 (daily ed. Sept. 17, 2008) (statement of Rep. George Miller). Of course, the original intent of the ADA is best captured by the passionate words of Senator Harkin, whose brother Frank is deaf, when he delivered the Senate’s first sign language floor speech upon the ADA’s passage, “that today Congress opens the doors to all Americans with disabilities; that today we say no to fear, that we say no to ignorance, and that we say no to prejudice.” 136 Cong. Rec. S9684-03 (daily ed. *9 July 18, 1990) (statement of Sen. Tom Harkin).
Importantly, federal regulations and agency rules promulgated to implement the 2008 amendments declare multiple sclerosis to be a disability. See 29 C.F.R. § 1630.2(j)(3)(iii) (2013) (“[AJpplying the principles set forth in ... this section, it should be easily concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: ... multiple sclerosis substantially limits neurological function .... ”); see also Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, as amended, 76 Fed.Reg. 16,978-01, 16,987, 16,989, 17,004 (Mar. 25, 2011) (to be codified at 29 C.F.R. pt. 1630). Similarly, the introduction to a final agency rule explains:
The Amendments Act states that its purpose is “to reinstate a broad scope of protection” by expanding the definition of the term “disability.” Congress found that persons with many types of impairments — including epilepsy, diabetes, HIV infection, cancer, multiple sclerosis, intellectual disabilities (formerly called mental retardation), major depression, and bipolar disorder — had been unable to bring ADA claims because they were found not to meet the ADA’s definition of “disability.” Yet, Congress thought that individuals with these and other impairments should be covered and revised the ADA accordingly. Congress explicitly rejected certain Supreme Court interpretations of the term “disability” and a portion of the EEOC regulations that it found had inappropriately narrowed the definition of disability.
Id. at 16,987. Thus, it is now clear that federal law considers multiple sclerosis to be a disability.
Goodpaster contends the ADA Amendments Act of 2008 requires us to interpret of the ICRA to include multiple sclerosis. We disagree, at least with his initial phrasing of the point. Federal law does not necessarily control our interpretation of a state statute. Iowa employers must follow federal law, but it is axiomatic that an amendment to a federal statute does not simultaneously and automatically amend a parallel or even identical Iowa statute. Just as “we are not bound by federal cases construing a federal statute when we are called upon to construe our own Civil Rights Act,” Loras Coll. v. Iowa Civil Rights Comm’n, 285 N.W.2d 143, 147 (Iowa 1979), we are not bound by the language of federal statutes when interpreting language of the ICRA, cf. DeBoom v. Raining Rose, Inc., 772 N.W.2d 1, 7 (Iowa 2009) (“[W]e must be mindful not to substitute ‘the language of the federal statutes for the clear words of the [ICRA].’ ” (quoting Hulme v. Barrett, 449 N.W.2d 629, 631 (Iowa 1989))).
Notwithstanding, we recognize the Iowa Act “only pronounces a general proscription against discrimination and we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute.” Casey’s Gen. Stores, Inc. v. Blackford, 661 N.W.2d 515, 519 (Iowa 2003). Initially, we note that the ICRA declares that it “shall he construed broadly to effectuate its purposes.” Iowa Code § 216.18(1) (emphasis added). Of course, Toyota and Sutton did not construe the terms of the federal statute broadly. See Toyota, 534 U.S. at 196-98, 122 S.Ct. at 691, 151 L.Ed.2d at 630-31; Sutton, 527 U.S. at 488, 119 S.Ct. at 2149, 144 L.Ed.2d at 466; see also Alex B. Long, “If the Train Should Jump the Track ... Divergent Interpretations of State and Federal Employment Discrimination Stat *10 utes, 40 Ga. L.Rev. 469, 495 (2006) (“The Supreme Court’s restrictive reading of the ADA’s terms has provoked a large outcry from academics and the original sponsors of the measure in Congress.”); Sandra F. Sperino, Diminishing Deference: Learning Lessons from Recent Congressional Rejection of the Supreme Court’s Interpretation of Discrimination Statutes, 33 Rutgers L. Rec. 40, 42 (2009) (“[T]he Supreme Court has often chosen narrow statutory interpretations that do not comport with the liberal reading to be given to employment discrimination statutes.”). As noted by Representative Tony Coelho, the lead sponsor of the ADA in the House of Representatives who suffer from epilepsy, “The Supreme Court wrote me out of my own bill.” Tony Coelho, Our Right to Work, Our Demand to Be Heard: People with Disabilities, the 2004- Election, and Beyond, 48 N.Y.L. Sch. L.Rev. 729, 734 (2003). Indeed, the construction of the ADA was so narrow that Congress intervened.
In the past, section 216.18(1) has had a substantive impact on the outcome of a case. See, e.g., Polk Cnty. Secondary Rds. v. Iowa Civil Rights Comm’n, 468 N.W.2d 811, 815-16 (Iowa 1991) (distinguishing a narrow rule in Brown v. Pub. Emp’t Relations Bd., 345 N.W.2d 88 (Iowa 1984), because “Brown was not a civil rights case” and construing the ICRA “broadly to effectuate its purposes”). Indeed, this section has led us before to adopt broad definitions to eliminate employment discrimination. See Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm’n, 394 N.W.2d 375, 382-83 (Iowa 1986) (adopting a broad definition of “actual damages” in part because of precursor to section 216.18). Other state courts have relied upon similar broad language to depart from narrow federal civil rights precedent. See Frieler v. Carlson Mktg. Grp., Inc., 751 N.W.2d 558, 573 (Minn.2008) (indicating broader view of civil rights statute required because state law explicitly “requires liberal construction of its terms”); Genaro v. Cent. Transp., Inc., 84 Ohio St.3d 293, 703 N.E.2d 782, 785 (1999) (same); Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43, 49-50 (1996) (rejecting federal caselaw holding independent contractors are not protected under employment discrimination law and relying in part on explicit requirement to construe state statute liberally).
Further, unlike federal law, where civil rights protections against employment discrimination are scattered into three statutes — the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2, the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623(a), and the ADA, 42 U.S.C. § 12112 — Iowa has one unified statute, Iowa Code chapter 216. While numerous fractures in the federal law have developed depending upon the statute involved, no such fractures arise under Iowa law. See Sandra F. Sperino, Revitalizing State Employment Discrimination Law, 20 Geo. Mason L.Rev. 545, 546-64 (2013).
These initial observations reveal Toyota and Sutton, which were explicitly built upon a core premise that the ADA must be “interpreted strictly to create a demanding standard for qualifying as disabled,” Toyota, 534 U.S. at 197, 122 S.Ct. at 691, 151 L.Ed.2d at 631; accord Sutton, 527 U.S. at 488, 119 S.Ct. at 2149, 144 L.Ed.2d at 466, are inapposite to any discussion of the meaning of the ICRA. Thus, we find these federal cases do not aid in the interpretation of our Iowa statute today.
We acknowledge we relied on Toyota and Sutton in a 2004 case to resolve a claim under the ADA. See Hansen v. Seabee Corp., 688 N.W.2d 234, 239-40 (Iowa *11 2004). A close reading of Hansen, however, reveals it was solely an ADA case. See id. at 235-37. In Hansen, a worker noticed he had a sore back and was subsequently diagnosed with a sacroiliac lesion. Id. at 236. Eventually, he was laid off and filed a disability discrimination lawsuit under the ICRA and then subsequently amended his petition to include a claim under the ADA. Id. Following a bench trial, the district court directed a verdict for the defendant on plaintiffs state-law claim, reasoning plaintiff was not disabled under the ICRA. Id. at 237. However, the court found plaintiff was disabled under the ADA and entered judgment for the plaintiff. Id. In summarizing the posture of the case on appeal, we explained that Seabee appealed, alleging “Hansen failed to establish he was disabled under the ADA. Hansen did not cross-appeal or otherwise rely upon his state claims to support the district court judgment. Consequently, our review is limited to the federal ADA claim.” Id. Relying on Toyota and Sutton, we determined the plaintiff was not disabled under the ADA and reversed the district court. Id. at 239-44. Accordingly, Hansen similarly has no bearing on our determination of whether multiple sclerosis is a disability under the ICRA.
On the other hand, we are guided by the broad reach early interpretations gave the Act. An early — and influential — law review article regarding Iowa’s law against disability discrimination in employment opined that, broadly speaking, three categories of disabilities exist under Iowa law:
The category [into which a purported disability fits] will depend on the nature of the particular disability and the specific allegations of discrimination. The first category consists of disabilities which, on their face, are acknowledged to be substantial handicaps. Blindness, deafness, epilepsy, paralysis — these and other permanent impairments are clearly protected. The second category consists of handicaps which the Commission regards as insubstantial per se. Migraine headaches, common colds, the flu, a simple fracture and other temporary conditions of a relatively trivial nature exemplify this category. The third category is the most difficult to describe. It consists of impairments which are neither permanent nor evanescent, but which fall somewhere in the middle. Addiction to drugs or alcohol, various kinds of mental illnesses, and periods of recovery from major surgery illustrate the types of intermediate-term impairments which, depending on the totality of the circumstances, may or may not be protected.
Scott H. Nichols, Iowa’s Law Prohibiting Disability Discrimination in Employment: An Overview, 32 Drake L.Rev. 273, 328-29 (1983) [hereinafter Nichols]. Multiple sclerosis is not part of the second category consisting of insubstantial impairments. Rather, multiple sclerosis is very likely among the group in which certain impairments, “on their face, are acknowledged to be substantial handicaps.” Id. at 239.
Schwan’s points out that we have held a condition must be “‘permanent or long term’ ” to qualify as disabling. See Vincent v. Four M Paper Corp., 589 N.W.2d 55, 61 (Iowa 1999) (internal quotation marks omitted). In Vincent, we noted that one factor in determining whether a condition substantially limits a major life activity is “[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.” Id. (internal quotation marks omitted). The other factors are “[t]he nature and severity of the impairment” and “[t]he duration or expected duration of the *12 impairment.” Id. (internal quotation marks omitted).
Iowa law has for years contemplated some disabilities might be permanent but, unlike federal law, has never contemplated that a disability could not be intermittent or episodic. See Foods, Inc. v. Iowa Civil Rights Comm’n, 318 N.W.2d 162, 164-69 (Iowa 1982) (concluding plaintiff who suffered from intermittent grand mal seizures due to epilepsy could maintain ICRA claim in spite of an administrative regulation that required the disability be “unrelated” to the plaintiffs’ ability to perform available jobs). Clearly, the plaintiffs condition in Foods — epilepsy—did not substantially impair her ability to complete major life activities for large portions of time. Rather, she was only impaired — and then quite substantially — during grand mal seizures.
Similarly, we held alcoholism was capable of being a disability under the ICRA in Consolidated Freightways, Inc. v. Cedar Rapids Civil Rights Commission, 366 N.W.2d 522, 526-28 (Iowa 1985).[3] Additionally, we specifically contemplated that it was a protected disability “when the condition is arrested.” Id. at 528. We noted that alcoholism “is a substantial handicap, but if the alcoholic remains sober the disability should not prevent the individual from performing his or her job in a reasonably competent and satisfactory manner.” Id.
We also observe that the regulations promulgated by the commission to define disability were based heavily on the definition of disability contained in the Federal Rehabilitation Act of 1973, as amended, 29 U.S.C. § 705(20). Nichols, 32 Drake L.Rev. at 334. A number of federal cases applying the Rehabilitation Act of 1973 consider multiple sclerosis as a disability, often without any significant inquiry into the issue. See Fulton v. Goord, 591 F.3d 37, 40, 43 (2d Cir.2009) (holding plaintiff with multiple sclerosis had standing to pursue claim under Rehabilitation Act of 1973); Langon v. Dep’t of Health & Human Servs., 959 F.2d 1053, 1056, 1059-61 (D.C.Cir.1992) (holding summary judgment against plaintiff with multiple sclerosis was inappropriate); Carter v. Casa Cent., 849 F.2d 1048, 1050, 1053-54 (7th Cir.1988) (upholding district court ruling that plaintiff with multiple sclerosis was denied job as a result of disability); Pushkin v. Regents of Univ. of Colo., 658 F.2d 1372, 1387 (10th Cir.1981) (holding plaintiff with multiple sclerosis established he is a disabled person who was rejected from a residency program based on his disability); see also Flight v. Gloeckler, 68 F.3d 61, 64 (2d Cir.1995) (referring to multiple sclerosis as a disability and distinguishing it from the plaintiffs proffered basis of discrimination, his inability to drive).
Federal cases prior to Toyota considered whether multiple sclerosis is a disability and either considered it to be a disability, see Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 786 (8th Cir.1998), or contemplated it could constitute a disability based on testimony of how it impacts an individual’s life and work, see Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 884 (6th Cir.1996) (“To show she had a ‘disability,’ [plaintiff] must establish that she had *13 an impairment that substantially limited her major life activities....”); see also Flight, 68 F.3d at 64 (rejecting plaintiffs ADA claim because the ADA “is inapplicable because the distinction in the present case is not based upon Flight’s disability, múltiple sclerosis, but rather upon his inability to drive” (emphasis added)). Moreover, multiple sclerosis was considered a disability under other federal statutes (with statutory language similar to the ICRA) prior to the United States Supreme Court’s now-superseded decisions. See Jankowski Lee & Assocs. v. Cisneros, 91 F.3d 891, 895 (7th Cir.1996) (“It is clear that Rusinov’s MS is a handicap within the meaning of the [Fair Housing Act].”); see also Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 330, 336 (2d Cir.1995) (holding plaintiff who suffered from multiple sclerosis had demonstrated a likelihood of success on the merits of Fair Housing Amendments Act claim and was entitled to a preliminary injunction).
Accordingly, we hold multiple sclerosis can constitute a disability under the Iowa Act if the plaintiff produces evidence that the condition substantially impaired one or more major life activities during episodes or flare-ups, even if it did not impair life activities at all when in remission.
Turning to the evidence in this case, Goodpaster has generated a genuine issue of material fact regarding whether his multiple sclerosis substantially limits his major life activities. He testified that during flare-ups, he experiences vision impairment, memory loss, fatigue, and loss of control and strength in his arms and legs.
Schwan’s draws on easelaw that casts doubt on whether a substantial limitation can exist when the plaintiff experiences memory loss, see Crock v. Sears, Roebuck & Co., 261 F.Supp.2d 1101, 1117-18 (S.D.Iowa 2003), vision problems, see Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 904-05 (8th Cir.2010), fatigue, see Croy v. Cobe Labs., Inc., 345 F.3d 1199, 1204 (10th Cir.2003), or difficulty walking, see Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 685 (8th Cir.2003). However, these cases are ADA cases hailing from an era of federal law in which the ADA turned a blind eye to victims of episodic ailments. Crock, for instance, pointed out that the plaintiff there stated “some of [her] symptoms are constant while the severe symptoms are episodic,” and concluded “even severe symptoms which are episodic do not constitute a substantial limitation on a major life activity.” 261 F.Supp.2d at 1117. Crock then cites EEOC v. Sara Lee Corp., 237 F.3d 349, 353 (4th Cir.2001), in which the Fourth Circuit held profound symptoms associated with epileptic seizures did not amount to a disability under the ADA. Crock, 261 F.Supp.2d at 1117-18.
Crock correctly followed federal law as it existed in 2003. Yet, that state of the law is no longer extant. Sara Lee is inconsistent with Iowa law. Croy is similarly inapposite to the ICRA. A person may be disabled under the ICRA, even during the intermissions of their symptoms, so long as their symptoms constitute a substantial limitation when active. See, e.g., Consol. Freightways, 366 N.W.2d at 528; Foods, 318 N.W.2d at 168-69.
We hold Goodpaster generated a genuine issue of material fact regarding whether his multiple sclerosis substantially limits one or more of his major life activities.[4] He has at least generated a jury question.
*14 B. Whether Goodpaster is Qualified to Perform the Essential Functions of the Job With or Without Accommodation. Goodpaster must also be able to show he is qualified for the customer service manager position. See Schlitzer, 641 N.W.2d at 580. To do so, he must show he, “with or without reasonable accommodation, ‘can perform the essential functions of the position ... without endangering the health and safety of [himself] or others.’ ” Boelman, 522 N.W.2d at 80 (alteration in original) (quoting 29 C.F.R. § 1613.702(f) (1993)). We then consider whether Schwan’s failed to offer Goodpaster a reasonable accommodation. We use a two-step inquiry to determine whether an employee is qualified for a position. Id. at 80. First, the fact finder must determine if the employee can perform the essential functions of the position without an accommodation. Id. If an employee can perform the essential functions of a position without an accommodation, the employee is qualified and can make a prima facie ease of disability discrimination, and the inquiry at this stage of the case ends. See id. If the employee cannot perform the essential functions of the position, the fact finder must determine whether a reasonable accommodation exists that would permit the employee to do so. See id. If so, the employee is qualified; if not, the employee is not qualified for the position and cannot make a prima facie case of disability discrimination. See id. We address these inquiries in turn.
1. Qualified employee. The first step of our inquiry is whether Good-paster “could perform the essential functions of the job.” Id. “The ‘essential functions’ of the job are those that ‘bear more than a marginal relationship to the job at issue.’ ” Id. (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393 (5th Cir.1993)). We have said in the past that a person is qualified when the person “can perform the essential functions of the job ‘in spite of his or her disability.” Id. (quoting Miller v. Sioux Gateway Fire Dep’t, 497 N.W.2d 838, 841 (Iowa 1993)). “This inquiry must consider ‘[t]he nature and extent of a disability, the needs of a particular job, and the impact of disability on a person’s ability to perform that job.’ ” Courtney v. Am. Nat’l Can Co., 537 N.W.2d 681, 685 (Iowa 1995) (alteration in original) (quoting Frank v. Am. Freight Sys., Inc., 398 N.W.2d 797, 801 (Iowa 1987)). “ ‘[T]he court must consider whether the person has “the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires.” ’ ” Schlitzer, 641 N.W.2d at 531 (quoting *15 Treanor v. MCI Telecomms. Corp., 200 F.3d 570, 575 (8th Cir.2000)). “Whether an individual is qualified for a particular job, despite his or her disability, requires an individualized inquiry.” Courtney, 537 N.W.2d at 685.
In this case, the primary qualification at issue is whether Goodpaster could obtain the necessary DOT certification. The United States Supreme Court has held that an employer may defend a discriminatory termination action under the ADA when the employer terminated the employee pursuant to the DOT regulations requiring a certain level of visual acuity for commercial drivers. Albertson’s, Inc. v. Kirkingburg, 527 U.S. 555, 567-78, 119 S.Ct. 2162, 2169-74, 144 L.Ed.2d 518, 531-38 (1999). The reasoning behind this holding is that “[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law.” Id. at 573, 119 S.Ct. at 2172, 144 L.Ed.2d at 535. The Court stated:
The Senate Labor and Human Resources Committee Report on the ADA stated that “a person with a disability applying for or currently holding a job subject to [DOT standards for drivers] must be able to satisfy these physical qualification standards in order to be considered a qualified individual with a disability under title I of [the ADA].”
Id. at 573, 119 S.Ct. at 2172-73, 144 L.Ed.2d at 535 (quoting S.Rep. No. 101-116, at 25 (1989)) (first alteration in original).
Schwan’s argues Goodpaster was not qualified by essentially asserting the “direct threat” defense under the ADA, which provides that “[a]n employer may impose as a qualification standard ‘a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.’ ” Id. at 569, 119 S.Ct. at 2170, 144 L.Ed.2d at 532 (quoting 42 U.S.C. § 12113(b) (1994 & Supp. III)). A “ ‘direct threat’ [is] defined by the [ADA] as ‘a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.’ ” Id. (quoting 42 U.S.C. § 12111(3)). While conceptual daylight would ordinarily exist between the “essential function” aspect of a prima facie case of disability discrimination and the “direct threat” defense under the ADA, the inquiries appear to collapse together in this context. See Kapche v. City of San Antonio, 304 F.3d 493, 494, 500 (5th Cir.2002) (per curiam) (considering whether a police officer could safely perform an essential function of the position — driving and holding an individualized assessment of the officer’s claim using the direct-threat defense model is required).
The determination of whether an impairment substantially limits a major life activity and accordingly constitutes a disability under the Act should ordinarily be reviewed on a “case-by-case basis” even though “[s]ome impairments may invariably cause a substantial limitation of a major life activity.” Albertson’s, Inc., 527 U.S. at 566, 119 S.Ct. at 2169, 144 L.Ed.2d at 530-31. So too should the determination of whether a plaintiff is qualified to perform the essential functions of a position with or without accommodation generally be determined by a case-by-case analysis as opposed to resorting to a blanket exclusion of a class of workers from a given job. See 29 C.F.R. § 1630.2(r) (2013) (“The determination that an individual poses a ‘direct threat’ shall be based on an individualized assessment of the individual’s present ability to perform the essential functions of the job.” (Emphasis added.)); Kapche, 304 F.3d at 494, 500 (vacating grant of summary judgment and holding plaintiff with insulin-treated diabe *16 tes mellitus required individualized assessment of his “ability to safely perform the essential functions” of a police officer position, which included driving). There is no reason to take a contrary approach.
This conclusion is bolstered by federal regulations that provide guidance to medical examiners evaluating whether a driver who has a neurological condition may nevertheless obtain a commercial license. The mere diagnosis of a disease that could impact driving is insufficient to disqualify a driver. See 49 C.F.R. § 391.43 (“Instructions for Performing and Recording Physical Examinations”). The regulations provide: “Any neurological condition should be evaluated for the nature and severity of the condition, the degree of limitation present, the likelihood of progressive limitation, and the potential for sudden incapacitation.” Id. Furthermore, authority relevant to the criteria indicated that multiple sclerosis can result in disqualification, but it recognizes not all cases of multiple sclerosis are the same and that some people with multiple sclerosis may be able to obtain certification. U.S. Dep’t of Transp., Conference on Neurological Disorders and Commercial Drivers 28-29 (1988), www.fmcsa.dot.gov/ regulations/medical/eonference-neurologieal-disorders-and-commercial-drivers-part-i.
In this case, the record supported a conclusion that Goodpaster was recerti-fied to drive a commercial vehicle in 2008 and 2009. At the same time, the evidence revealed he did not tell the doctor who made the certification that he had multiple sclerosis in 2008, and the record was unclear about the result of the certification in 2009. Yet, Goodpaster at least generated a fact issue on the question whether he was qualified to perform the essential functions of the customer service manager position. Accordingly, a genuine issue of material fact exists regarding whether Goodpaster was qualified to perform the essential functions of the customer service manager position without accommodation.
2. Reasonable accommodation. Even with evidence in the record to support a conclusion that Goodpaster continued to be licensed to operate a commercial vehicle, Sehwan’s asserts Goodpaster still could not safely and adequately perform the essential functions of his job with accommodations because no reasonable accommodations existed. In other words, even with a license to drive, Schwan’s argues Good-paster was disqualified because he could not drive at times and his requested accommodations needed to overcome his inability to drive were unreasonable as a matter of law.
“If the plaintiff cannot perform the essential functions of the job, then the fact finder goes on to the second inquiry— ‘whether any reasonable accommodation by the employer would enable [the plaintiff] to perform those functions.’ ” Boelman, 522 N.W.2d at 80 (alteration in original) (quoting Chandler, 2 F.3d at 1394). This second phase of the inquiry stems from the unique nature of disability discrimination:
Discrimination against the disabled differs from other types of discrimination in that other types, such as racial, religious, or sex discrimination, usually bear no relationship to the individual’s ability to perform a job. Consequently, it is necessary to provide a requirement of reasonable accommodation in order to eliminate discrimination against the disabled.
Cerro Gordo Cnty. Care Facility v. Iowa Civil Rights Comm’n, 401 N.W.2d 192, 196-97 (Iowa 1987). Therefore,
[a]n employer shall make reasonable accommodation to the known physical or *17 mental limitations of an otherwise qualified handicapped applicant or employee unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its program.
Iowa Admin. Code r. 161 — 8.27(6).
“If an employee’s ability to do her job depends on reasonable accommodation, the employee must make a facial showing that reasonable accommodation was possible.” Schlitzer, 641 N.W.2d at 530. This showing is not an onerous one and requires no more of the employee than to propose an accommodation and present testimony of its feasibility. See, e.g., Wood v. Omaha Sch. Dish, 985 F.2d 437, 439 (8th Cir.1993) (“[P]laintiffs must initially meet the burden of providing evidence sufficient to make at least a facial showing that reasonable accommodation is possible. [Plaintiffs] have met their burden by proposing that defendants allow them to conduct self-blood-tests and to carry snacks.” (Citation omitted.)).
A regulation promulgated by the Iowa Civil Rights Commission specifies that a reasonable accommodation may include:
(1) Making facilities used by employees readily accessible to and usable by handicapped persons, and
(2) Job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions.
Iowa Admin. Code r. 161 — 8.27(6)(a). Another regulation provides:
When an individual becomes disabled, from whatever cause, during a term of employment, the employer shall make every reasonable effort to continue the individual in the same position or to retain and reassign the employee and to assist that individual’s rehabilitation. No terms in this rule shall be construed to mean that the employer must erect a training and skills center.
Id. r. 161 — 8.28.
If the plaintiff shows a reasonable accommodation is possible, “the burden shifts to the employer to prove that it is not able to accommodate the plaintiffs disability or that the proposed accommodation is unreasonable.” Boelman, 522 N.W.2d at 80. To do so, the employer must “demonstrate that the accommodation would impose an undue hardship on the operation of its program.” Iowa Admin. Code r. 161 — 8.27(6). Another regulation promulgated by the Iowa Civil Rights Commission provides:
In determining pursuant to the first paragraph of this subrule whether an accommodation would impose an undue hardship on the operation of an employer’s program, factors to be considered include:
(1) The overall size of the employer’s program with respect to number of employees, number and type of facilities, and size of budget;
(2) The type of the employer’s operation, including the composition and structure of the employer’s workforce; and
(3) The nature and cost of the accommodation needed.
Id. r. 161 — 8.27(6)(b). In other words, “[i]n considering the reasonableness of an employer’s accommodation of an employee’s disability, we must consider not only the disabled employee’s needs but also the economic realities faced by the employer.” Halsey v. Coca-Cola Bottling Co. of Mid-Am., Inc., 410 N.W.2d 250, 253 (Iowa 1987).
We have said “[a]n accommodation is unreasonable if it requires the employer to change the essential nature of the job or if *18 it places undue burdens on the employer.” Boelman, 522 N.W.2d at 80. For example, removing the duty of operating a forklift from the position of forklift operator— ninety-eight percent of the working hours of the position — was an unreasonable accommodation. Courtney, 587 N.W.2d at 687. We have also said in the past that a “reasonable accommodation must be made by an employer only if it does not substantially impinge on the rights of other employees or incur more than a de minimis cost to the employer.” Frank, 898 N.W.2d at 803.
The accommodations requested by Go-odpaster to overcome his inability to drive and perform his duties included having another employee pick him up when he needed to stop driving, rearranging his route, having a driver accompany him on his route, and reassigning him to a warehouse position. Schwan’s claims these accommodations were unreasonable as a matter of law.
The economic realities faced by an employer to provide an accommodation surface in this case. While a jury might reasonably conclude from the economic considerations in this case that a second driver would be an unreasonable accommodation, we recognize the record was generally underdeveloped on the issue of the reasonableness of accommodations. Moreover, the record was sparse because the district court cut the discovery short by granting summary judgment for Schwan’s based predominantly on its conclusion that the medical condition suffered by Good-paster was not a disability as a matter of law. As a result, the district court rejected the request by Goodpaster to seek further discovery on the reasonableness of possible accommodations, and this action should not now be used by Schwan’s to support its claim that there is no evidence in the record to support a triable issue on the reasonableness of the accommodations. On balance, the issue of the reasonableness of some of the requested accommodations presented a jury issue.
C. Whether the Circumstances of This Case Raise an Inference of Unlawful Discrimination. Schwan’s claims the evidence in the case could not, as a matter of law, establish an inference of discrimination because the only reasonable conclusion that can be drawn from the record is Goodpaster was fired for poor job performance and poor sales. It claims there was no evidence presented that the termination was motivated by disability discrimination.
Consistent with our resolution of the previous issues, the record supports the conclusion that Goodpaster presented a jury issue on whether the termination was motivated by his disability. There was some evidence that Schwan’s relied on Go-odpaster’s “health issues” in terminating him. Additionally, the record was not fully developed because the district court denied additional discovery.
IV. Conclusion.
Having considered all issues raised, we reverse the summary judgment granted by the district court. We remand the case for further proceedings.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
All justices concur except WATERMAN and MANSFIELD, JJ., who dissent.

. Neither our Code nor regulations explicitly refer to a "substantially handicapped person” *7 in any other place. Instead, it appears the legislature and the Iowa Civil Rights Commission have updated the phrasing in other areas. See, e.g., Iowa Code § 216.2(5) (" ‘Disability’ means the physical or mental condition of a person which constitutes a substantial disability, and the condition of a person with a positive human immunodeficiency virus test result, a diagnosis of acquired immune deficiency syndrome, a diagnosis of acquired immune deficiency syndrome-related complex, or any other condition related to acquired immune deficiency syndrome.” (Second emphasis added.)). Nonetheless, we believe this regulation is intended to provide the relevant definition of those persons covered by the ICRA and accordingly take notice of this provision.

. The court in Nyrop acknowledged a series of 2008 amendments substantially modifying the ADA, which we discuss further below, but found the amendments were not retroactive *8 and did not apply them to decide the case. 616 F.3d at 734 n. 4.

. We note that, in Consolidated Freightways, we considered whether the employee was disabled under a Cedar Rapids city ordinance. See 366 N.W.2d at 524. Iowa Code section 216.19 requires cities to secure the rights protected by the ICRA and permits cities to provide greater protections against unfair or discriminatory practices. See Iowa Code § 216.19. The city ordinance at issue in Consolidated Freightways, however, contained a definition that was "almost identical” to the definition of "disability” in the ICRA. See 366 N.W.2d at 526. Therefore, we find Consolidated Freightways persuasive.

. In addition to the major life activity of walking, for example, a genuine issue of material fact exists regarding whether Goodpaster's multiple sclerosis substantially limits his abili *14 ty to work. This is unsurprising, as the ability to work is something of a disability discrimination catchall, and “impairments that substantially limit a person’s ability to work usually substantially limit one or more other major life activities.” See 29 C.F.R. § 1630.2(j) app. (2013). To be clear, in the past, we required the proffered disability to be “generally debilitating” and to "affect [the employee] regardless of the job he might hold.” Henkel Corp. v. Iowa Civil Rights Comm ’n, 471 N.W.2d 806, 810 (Iowa 1991). We said, "An impairment that interferes with an individual’s ability to do a particular job but does not significantly decrease that individual's ability to obtain satisfactory employment otherwise is not substantially limiting within our statute.” Probasco v. Iowa Civil Rights Comm’n, 420 N.W.2d 432, 436 (Iowa 1988); accord Jasany v. United States Postal Serv., 755 F.2d 1244, 1248 (6th Cir.1985); Salt Lake City Corp. v. Confer, 674 P.2d 632, 636-37 (Utah 1983). Schwan's asserts Good-paster’s multiple sclerosis was not generally debilitating because Goodpaster is qualified for other jobs and currently works as a laborer. However, Henkel, which itself involved a disability discrimination claim based on depression and anxiety, suggests multiple sclerosis is in fact generally debilitating. See Henkel, 471 N.W.2d at 810.