**IN THE COURT OF APPEALS OF IOWA**

No. 16-0954
Filed September 27, 2017

**LISA REMMICK,**
        Plaintiff-Appellant,

**vs.**

**MAGELLAN HEALTH, INC., MAGELLAN HRSC, INC.,
and JULIE CARLSON,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell,

Judge.


        Lisa Remmick appeals the district court's grant of summary judgment to

the defendants on her claims of disability discrimination, hostile work

environment, and retaliation. **AFFIRMED.**



        Jill Zwagerman and Beatriz Mate-Kodjo of Newkirk Zwagerman, P.L.C.,

Des Moines, for appellant.

        Michael A. Dee and Megan Erickson Moritz of Brown, Winick, Graves,

Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellees.


        Heard by Tabor, P.J., and Mahan, S.J.,* and Scott, S.J.*

        *Senior judges assigned by order pursuant to Iowa Code section 602.9206

(2017).

**SCOTT, Senior Judge.**

Lisa Remmick, a former employee of Magellan Health, Inc., filed suit against Magellan[1] and her former supervisor, Julie Carlson, raising claims under the Iowa Civil Rights Act (ICRA) based on Remmick's mental health disability. The district court granted summary judgment in favor of the defendants, finding no genuine dispute of material fact on her claims of disability discrimination, hostile work environment, and retaliation. Remmick now appeals. Finding no error, we affirm the court's grant of summary judgment.

### I.      Facts and Prior Proceedings

We start with an overview of the facts from the summary judgment record, taken in the light most favorable to Remmick, the nonmoving party. *See Roll v. Newhall*, 888 N.W.2d 422, 425 (Iowa 2016). At the age of sixteen, Remmick was diagnosed with depression. Her current diagnoses include recurrent, severe major depressive disorder and generalized anxiety disorder. Remmick managed her illness, did "all the daily living tasks that people do," graduated from college and graduate school, married, had two children, and worked as a social worker. Remmick used medications to treat her illnesses. When her medications became less effective, they were adjusted—known as a "med wash."

In October 2001, Remmick began working for Magellan; she helped Iowa adults and children on Medicaid find mental health professionals, hospitalization, and treatment programs. She was promoted from regular case manager to intensive case manager (ICM) in August 2008. Remmick described her ICM job duties as "extremely more difficult" than the duties of a regular case manager:

---

[1] Remmick also sued Magellan's affiliate, Magellan HRSC, Inc.

"We were working with the sickest of the sick population, the homeless, the extremely, extremely mentally ill, children in PMIC situations, which are psychiatric mental institutes for children."[2]

In June 2010, Carlson became Remmick's supervisor, and Remmick told Carlson she struggled with mental health issues. Carlson thought Remmick was a good employee and assigned her to train new staff; Carlson "was impressed by how [Remmick] worked with members and advocated for them." According to Carlson, Remmick received quarterly bonuses most of the time.[3]

**2012 Medical Leave.** In the fall of 2012, Remmick's depression flared, and she told Carlson about her suicidal ideation. A few weeks later, Remmick told Carlson her doctor wanted her to take medical leave for treatments. Magellan accommodated her October request for leave, and Remmick returned to work on December 10, 2012.

**Winter 2013.** Upon Remmick's return to work, she believed her co-workers were dismissive and cold to her. She observed they no longer talked or lunched with her. Remmick felt isolated.

**Spring 2013.** Remmick told Carlson she thought her co-workers were treating her differently than they had treated another co-worker who had needed personal leave—"[t]hey sent [the co-worker] care packages and cards, but they didn't send [Remmick] anything when she had been on leave." In response,

---

[2] This job requires the employee be a licensed social worker, a mental health counselor, or a registered nurse.
[3] Remmick's employment history shows she was ranked at "consistently meets" expectations in 2007 and 2008 (rank #3), improved in the following three years, 2009 to 2011 (3.6 to 3.8 to 3.9), and further improved to rank #4, "consistently exceeds" expectations, in 2012 and 2013 (4 to 4.2). Similarly, her salary improved each year.

Carlson told Remmick: "They know that she's getting cancer treatments. [She] is openly sharing her illness. It's easy to support someone when you know exactly what's going on and you know how to support someone." Carlson found it hard to respond to Remmick's complaint because Carlson believed Remmick's co-employees had called and sent flowers. Although Remmick testified the atmosphere at work upon her return from this leave made her illness worse, she did not contact human resources or ask Carlson to take any action.

**Summer 2013.** According to Remmick, she again spoke to Carlson in June 2013 about her worsening depression and health. According to Carlson, in June or July 2013, Remmick explained she would be doing a special therapy over her lunch period, and Carlson knew Remmick had an intermittent FMLA leave set up for the therapy. At the end of July 2013, Remmick's therapist noted the new therapy had worsened Remmick's condition.

**August 2013 Medical Leave.** Approximately August 2, Remmick received a bonus for her work production. Remmick was voluntarily hospitalized for one night on Sunday, August 4, for suicidal ideation. Remmick stated she had been having increased anxiety over the last month, was nauseous, and was not eating well. She also told hospital employees there was not a precipitating factor causing her feelings. The hospital's doctor changed her medications and discussed disability benefits with her.

Remmick tearfully talked to Carlson on Friday, August 9, "brainstorming options." Remmick told Carlson she did not think she could do her job anymore, she was overwhelmed and stressed, and she wished she had taken the position another employee had just filled. Remmick acknowledged: "[I]t's really not an

option now because that position's full." Carlson remembers saying, "I've noticed . . . you're struggling and that you're just not advocating for your clients like you did a year ago." When Remmick became defensive, Carlson recalled telling Remmick her job was not in jeopardy.

During Remmick's regular morning appointment with her psychiatrist on Monday, August 12, she stated she felt only a little better than when she was hospitalized. Her doctor noted:

> She feels she does not function as well at work. Her boss pulled her aside and had a conversation with her about her lack of energy and ambition and caring for the clients the way she had previously. Nonetheless, this was not a work reprimand, it was not a written letter, and her boss assured her that she should not be worried about termination.

The doctor took Remmick off work "for the time being" for a med wash and to wait for the new medicine regime to work, planning to see her the next week. Remmick returned to work and had an emotional talk with Carlson about taking another leave. According to Carlson, Remmick was crying and shaking. Remmick told Carlson she was not eating or sleeping and was overwhelmed. Remmick talked about how important her job was to her and her concern her co-workers would be even more hostile to her if she took another leave when the team was already "short-staffed." Remmick recalled "it was a condition of me getting out the door that day" "that I would need to stand before my co-workers and share my illness."

Carlson brought the first two co-workers into a private office to talk with Remmick. Carlson stayed for that emotional conversation while Remmick shared the details of her struggle with mental illness and her need for medical leave.

Remmick recalls she was crying and one co-worker in the first meeting asked her very "prying" questions. The other co-worker gave Remmick a hug. Carlson brought in the other two co-workers and then left for a personal training appointment. Remmick again shared her illness with her co-workers. The co-worker who worked Polk County with Remmick immediately became angry and yelled at Remmick, stating Remmick's medical leaves were her causing stress. After these emotional conversations, Remmick left on leave. Remmick was humiliated by being forced to disclose her private medical information to her co-workers. Carlson admitted Remmick's medical leave was not any business of Remmick's team members under Magellan's policy.

While Remmick knew "her work would have to be reassigned while she was on leave," Carlson opted to assign Remmick to a new territory upon her return to work. In a phone call with Carlson, Remmick learned of Carlson's decision. Remmick believed working a new territory "would be like the start of a whole new job."

**September 2013—Notify Management and Management Investigation.** On September 3, Remmick met with her therapist, whose notes state her psychiatrist would release her to work. The therapist's notes also discussed Remmick's "occupational problems":

> [Remmick] spoke to [her] lawyer this morning, she needs to return to work on Friday, letter will be sent to workplace . . . . If she doesn't and she uses up all her FMLA, she is at risk of being fired . . . . Went over what she can say if asked to meet with supervisor and bosses—what they need to know is in FMLA paperwork . . . . Additional concerns at work: . . . co-worker who is judgmental—she can look from her to [family pictures], can pray for her.
> . . . .

Additional Notes Regarding Goals and Objectives: Focused primarily on triggers at work.
Plan: Meet in one week.  Check in on work situation . . . .

Also on September 3, 2013, Remmick's attorney e-mailed a letter to Magellan alleging disability discrimination by (1) Remmick's co-workers upon her December 2012 return to work and (2) supervisor Carlson forcing Remmick to disclose personal medical information before the August 2013 leave.  Counsel also complained about Carlson removing Remmick from Polk County, where she had worked for twelve years:

> [Remmick] was being reassigned to another area.  This particular area was just abandoned by another employee who said it was too stressful and difficult.  So, not only is she being assigned to a more stressful area, she will have lost all of her contacts [in Polk County] that she has established . . . .  This will likely affect her productivity and her ability to bonus.

Noting Remmick would be back to work "by the end of the week," counsel asked Magellan to conduct an immediate investigation, return Remmick to her prior position, and immediately and properly train "the other employees."

Magellan immediately began an investigation.  On Friday, September 6, 2013, Remmick returned to work for one day—the last day she worked at Magellan.  Remmick testified she returned "because I thought I was ready, and [my doctor] obviously thought I was ready," and Remmick admitted her fear of losing her FMLA benefits and then being terminated "could have been part" of the reason she returned.  Carlson gave Remmick the more stressful territory, which "felt like a punishment" to Remmick, so Remmick asked Carlson to return her to the Polk County territory.  According to Carlson, she told Remmick she would think about it because Carlson first wanted to talk to another manager.

Near the end of the day, Carlson granted Remmick's request. In response, the co-working who would be sharing Polk County with Remmick slammed a Polk County file on Remmick's desk and glared at her. But Remmick acknowledges there was no cut in her pay, no loss of benefits, and no change in her job duties.

Remmick attempted suicide over the weekend, and her doctor placed her on medical leave on September 9, 2013. Magellan's September 11, 2013 letter to Remmick stated she had exhausted her FMLA leave—twelve weeks within a twelve-month period—and noted she was "eligible for short-term disability (STD) benefits." Remmick's health benefits would "remain intact" while she was approved for STD benefits. Remmick called Carlson to find out if Magellan would hold her job for her, and Carlson replied Magellan would. Magellan paid Remmick STD benefits. On September 27, Remmick timely filed charges of employment discrimination with the Iowa Civil Rights Commission (ICRC).

**October 2013—Magellan Investigation Completed.** Magellan disciplined Carlson on October 16, instituting a "performance improvement plan" and issuing her a "final written warning."[4] Magellan required all employees of the ICM team to attend sensitivity and diversity training on October 18, 2013. On October 25, Magellan investigator Andrea Whitfield told Remmick that Magellan had addressed her concerns. In this conversation, Whitfield asked if Remmick had a potential return date. When Remmick replied she did not and would see

---

[4] Magellan determined Carlson "demonstrated poor judgment regarding an employee's medical/mental health and [leave of absence] situation . . . . [Y]our involvement in the matter was inappropriate and unacceptable and could potentially put the company at legal risk." The "final written warning" stated Carlson had not applied "seasoned judgment" and had not fostered "a positive work environment for all direct reports."

her doctor in three weeks, Whitfield asked whether there was any accommodation for her condition that would allow her to work and offered to send accommodation forms. Remmick knew her job was still open for her, but she was unable to work.

**November 2013—No Accommodations or Restrictions Would Allow Remmick to Work.** Whitfield's November 6 letter recapped the conversation, enclosed a blank workplace accommodation form, and concluded:

> I wanted to acknowledge your statement that not all of your leave time was due to illness but some of the time off was due to not wanting to be in an uncomfortable work environment. As I conveyed to you . . . please be assured that Magellan took your concerns very seriously and Human Resources conducted a thorough investigation into each of [your concerns]. Appropriate steps were taken to address issues found. Again, upon your return to the workplace, Human Resources will be available to you should you need to raise any further issues.

Also on November 6, Remmick called Whitfield because she thought her job had been posted online. Whitfield assured Remmick the posting was for a new position and told her the accommodation form was in the mail.

On November 11, Remmick, who was seeing her psychiatrist the next day, called Whitfield, and Whitfield explained if Remmick's doctor did not release her to return to work or if Remmick was released with restrictions, Remmick "would need to get the paperwork completed." On November 12, Remmick's psychiatrist asked Magellan for a copy of her job description, which Magellan provided. On November 18, Remmick's psychiatrist completed Magellan's workplace accommodation form, and Remmick signed it. In response to the form's question asking if Remmick's condition limited her ability to perform any of the essential functions of her job, Magellan was told: "Yes. Severity of symptoms

precludes her ability to tolerate the demands of sustained competitive employment. She is struggling to meet daily needs." As to workplace restrictions, Magellan was told: "N/A—not currently able to work." Similarly, the response to "workplace accommodations that are being sought in order to perform the essential functions of the job" was left blank.

**December 2013**. On December 3, Whitfield and Remmick discussed her current leave of absence and potential return to work. Remmick confirmed her doctor could not provide an estimated release-to-work date and told Whitfield she had discussed long-term disability with her doctor and neither her doctor nor her therapist would release her to return to Magellan. Whitfield's December 10 confirming letter explained Whitfield needed to "have the most accurate and up to date information possible about your need for leave and ability/intention to return to your job at Magellan." Whitfield asked Remmick to contact her by December 19, 2013, if Remmick had additional information.

Remmick met with her psychiatrist on December 11; those notes stated Remmick was unable to work. Remmick applied for SSDI benefits, detailing her inability to work.

**January 2014.** Whitfield's January 20, 2014 letter to Remmick noted she had been away from work since September 9, 2013, and stated: "Based on the information you have provided to date," including no new information after the December 10 letter, "coupled with Magellan's business and operational needs, we can no longer hold your position for you." "[Y]our STD coverage will expire February 9, 2014. Consequently, we will terminate your employment with Magellan effective February 9, 2014."

**Litigation.** The ICRC found the actions of Remmick's co-workers were "rude, abrasive, unkind, and insensitive" but not sufficiently severe or pervasive to be disability harassment. The ICRC found otherwise as to Carlson's actions, concluding her actions were subjectively and objectively unreasonable; however, Magellan could "likely establish an affirmative defense." On Remmick's retaliation claim, because her reassignment lasted less than one day, the ICRC found she failed to prove she suffered an adverse employment action. The ICRC issued a right to sue letter. Remmick filed a timely petition against Magellan and Carlson in October 2014, and an amended petition on January 20, 2015.

In Remmick's February 2016 deposition, she testified she is not able to work currently and her doctor had not released her to work. The defendants sought summary judgment in March 2016. At the motion hearing, Remmick's counsel agreed that from the day Remmick stopped working for Magellan to the date of her deposition, i.e., September 6, 2014—February 11, 2016, Remmick had "not been capable of working." Counsel also stated Remmick had not been released to work as of the April 11, 2016 hearing, but she is "getting closer." In May 2016, the court granted the defendants' motion. Remmick now appeals.

## II. Scope and Standards of Review

We review the district court's grant of summary judgment for correction of legal error. *Goodpaster v. Schwan's Home Serv. Inc.*, 849 N.W.2d 1, 6 (Iowa 2014). Summary judgment should be granted when "the record reveals a conflict only concerns the legal consequences of undisputed facts." *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139-40 (Iowa 2013) (citation omitted). When reviewing the district court's grant of summary judgment, "we examine the record in the

light most favorable to the nonmoving party," drawing "all legitimate inferences the evidence bears in order to establish the existence of questions of fact." *Id.* Thus, "in deciding if a genuine issue of material fact exists, we resolve all disputed facts and draw all inferences in favor of the plaintiff." *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 657 (Iowa 2008).

"To the extent [an] appeal involves questions of statutory interpretation, we review for correction of errors at law." *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016) (citation omitted). The ICRA is construed "broadly to effectuate its purposes." Iowa Code § 216.18(1) (2013).

### III.    Disability Discrimination

The ICRA provides "it shall be an unfair or discriminatory practice" to discharge or otherwise discriminate against an employee

> because of the . . . disability of such . . . employee, unless based upon the nature of the occupation. If a person with a disability is qualified to perform a particular occupation by reason of training or experience, the nature of that occupation shall not be the basis for exception to the unfair or discriminating practices prohibited by this subsection.

*Id.* § 216.6(1)(a). To establish a prima facie case of disability discrimination under the ICRA Remmick must prove: (1) she has a disability, (2) she was qualified to perform the job either with or without an accommodation for her disability, and (3) she suffered an adverse employment decision because of her disability. *See Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003). We resolve this claim on the second element.

### A. Qualified Employee

Under the second element, Remmick is required to show she is qualified for the ICM position. *See Goodpaster*, 849 N.W.2d at 14 (citation omitted). Iowa courts use "a two-step inquiry to determine whether an employee is qualified for a position." *Id.* In the first step, the fact finder determines "if the employee can perform the essential functions of the position without an accommodation." *Id.* If so, the employee is qualified. *Id.* But where the employee cannot perform, the fact finder moves on to the second step—"whether any reasonable accommodation by the employer would enable [the plaintiff] to perform those functions." *Id.* at 16 (alteration in original) (citation omitted). Under step two, if a reasonable accommodation exists, the employee is qualified. *Id.* at 14. If no reasonable accommodation allows the employee to perform the essential functions, "the employee is not qualified for the position and cannot make a prima facie case of disability discrimination." *Id.*

In short, the disabled employee's ability to perform the job's essential functions is a required element in a disability discrimination claim, i.e., "qualified employee," and Iowa courts evaluate the interrelationship of (1) the *extent* of the employee's disability and (2) the essential job functions.[5] *See id.*

---

[5] On appeal, Remmick contends there is a fact question as to whether she is a qualified employee because the disability leading to her inability to perform her job was *caused* by her co-workers' treatment when she returned from her first leave and by Carlson requiring Remmick to explain her illness to her co-workers before her second leave. Remmick's brief argues: "Magellan should not be able to find a loophole in the disability laws that require someone to be able to complete the essential functions of the job when the person cannot complete the essential functions of the job because of the violations of the disability laws." During oral argument, Remmick's counsel admitted to having "no authority" for this proposition.

We agree with the district court's resolution: Remmick's status as a qualified employee "does not depend on the *cause* of [her] disability, but rather on the *extent* of

**B. Qualified Without Accommodation**

The fact finder conducts an "individualized inquiry" to determine whether an employee "is qualified for a particular job, despite his or her disability." *Id.* at 15 (citation omitted). Remmick argues she provided sufficient evidence she was qualified by her "education, job experience, and success in that exact position" and asserts "qualified" is not a high standard under the language, "by reason of training or experience," in the second sentence of section 216.6(1)(a).

We agree the factors to be considered include a plaintiff's "requisite skill, experience [and] education [for] the employment position," which Remmick has. *See id.* at 14. But Remmick cites no Iowa law supporting her contention the fact finder's "qualified employee" inquiry stops with those factors, and "we are not at liberty to overturn precedent of our supreme court." *Figley v. W.S. Indus.*, 801 N.W.2d 602, 608 (Iowa Ct. App. 2011). Iowa case law requires more of a plaintiff: "This inquiry must consider [t]he nature and extent of a disability, the needs of a particular job, and the impact of disability on a person's ability to perform that job." *Goodpaster*, 849 N.W.2d at 14 (alteration in original) (citations omitted); *see Schlitzer v. Univ. of Iowa Hosps. & Clinics*, 641 N.W.2d 525, 532 (Iowa 2002) (holding nurse "failed to show she was qualified" when a "disability substantially limits her ability to lift and makes a clinic nurse's job incompatible" with her disability).

---

her disability." *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 583-84 (1st Cir. 1992); *see Simo v. Home Health & Hospice Care*, 906 F. Supp. 714, 721 (D.N.H. 1995) (stating requirement "plaintiff be otherwise qualified actually may benefit a discriminatory employer [where] plaintiff's disability resulted from the employer's wrongful conduct, [but] potential for an incongruous result does not dispose of the statutory requirement [a] plaintiff be capable" of working "to state her claim").

First, as to the nature and extent of Remmick's disability, her second leave started on August 12, 2013. Thereafter, on November 18, 2013, Remmick's treating psychiatrist found Remmick incapable of sustained competitive employment and also found no workplace accommodations would enable Remmick to do her job. In December 2013, Remmick and her doctor described her *inability to work* in her application for SSDI benefits. When Magellan terminated Remmick in February 2014, she had exhausted her STD benefits, she had neither sought workplace accommodations nor provided a return-to-work date after November 18, 2013, and she had not returned to work. Remmick remained unable to work at any job in April 2016.

Second, as to the needs of Remmick's particular job of managing ICM cases, she generally was required to (1) regularly interact with co-workers, patients, and providers, (2) utilize time management skills and organization skills, and (3) understand and analyze selection criteria, policies, procedures, and governmental regulations. Carlson explained ICMs work with members and providers "to help them develop treatment plans that were robust and able to really address whatever the issue was that was leading to hospitalizations or placement disruptions."

Third, as to the impact of Remmick's disability on her ability to perform her job's essential functions, Remmick's SSDI application explained her inability to meet those functions: (1) I "[d]on't want to be around others and my job requires me to talk to people all day"; (2) I "[h]ave lost my skills or desire to help others—every minute at work felt like an hour"; (3) I have "compassion fatigue"; (4) "I can't work, go in public, don't want to see people"; (4) "My memory is awful—at

work you have tons of tasks to keep track of," and I cannot "concentrate enough to complete task"; and (5) I am too anxious to talk to people I know.

Based on the appropriate factors, we find no error in the district court's conclusion: "By her own admission, Ms. Remmick's disability served as an impediment to virtually every essential function of her job, thus rendering her unqualified under the ICRA."

### C. Qualified with Accommodation

We turn to the "second inquiry—whether any reasonable accommodation by [Magellan] would enable [her] to perform those functions." *Goodpaster*, 849 N.W.2d at 16. Remmick has the burden of making "a facial showing that a reasonable accommodation was possible." *Id.* at 17. This showing requires Remmick "to propose an accommodation and present testimony of its feasibility."[6] *Id.*

1. *Accommodation for Existing Position*. Remmick contends she, at least once, asked someone in human resources if she could work from home. She testified: "I can unequivocally tell you with all positivity that I asked someone—I can't say who or at what point—if I could work from home and it was not going to be a possibility." While it is undisputed other ICM employees did some work from home, Remmick has provided no explanation for the inconsistency in her appellate claim she could have performed the essential functions of her ICM job with a "work from home" accommodation and her

---

[6] If Remmick shows "a reasonable accommodation is possible," the burden shifts to Magellan to show either "it is not able to accommodate [Remmick's] disability" or "the proposed accommodation is unreasonable." *Goodpaster*, 849 N.W.2d at 16 (citation omitted).

testimony about the nature of her disability on December 19, 2013, shortly before her February 9, 2014 termination:

> A. . . . I could barely brush my teeth, function . . . . I had to at some point get staff assistance to be able to read mail and answer text messaging. I don't know when I received these letters, when I read them, if I retained them, how I retained them, what they even meant to me at that point. I was sick.
>  . . . .
> Q. . . . [I]n your own personal experience with this illness and as a mental health professional, if you're unable to brush your teeth, answer mail, cleanse yourself, barely able to take care of your kids, that means you weren't able to work either, doesn't it? A. Not at Magellan. Not under those conditions.
> Q. What about anywhere else? I mean, can you do another job with the inability to perform those basic personal functions? Do you think? A. No. I was too ill.

Based on Remmick's own testimony, she was so ill in December 2013 that she could "barely" manage her basic needs. She expressed this fact again in her application for SSDI benefits. At no point prior to her February 2014 termination did Remmick submit an updated form to Magellan requesting accommodations. She has provided no tangible record evidence her illness and capacity for work improved before she was terminated, and she, in fact, continued to be incapable of working at any job in April 2016. Thus, the record negates "an essential element of her [discrimination] case—at least if she does not offer a sufficient explanation." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (stating plaintiffs "cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim"). Remmick has not "offered a sufficient explanation" as a matter of law; there is no disputed factual issue that prior to her termination, Remmick was too ill to perform the essential functions of her ICM job with a "work at home" accommodation. *See id.* at 807.

2. *Accommodation of Different Position.* Remmick claims she asked Carlson in June or July 2013 about moving to a less stressful department, faulting Carlson for her inaction: "Instead of looking into reassignment, Supervisor Carlson told Ms. Remmick in the same conversation no other positions were available." In support, Remmick cites an excerpt from Carlson's deposition. But in that excerpt, Carlson stated they had a "brainstorming session" on August 9 and specifically denied the discussion occurred sometime in June or July 2013. According to Carlson, "we talked about her moving to another department" and Remmick "brought up that, you know, 'I wish I would have done that, and it's really not an option now because that position's full.'" Thus, the record cited by Remmick does not support the appellate proposition advanced. Second, her psychiatrist's notes from August 12 also show this conversation likely occurred on August 9. Finally, according to Remmick:

> Q. [Carlson] asked you if you'd be interested in a transfer to a less stressful position. Is that what you remember? A. Yes. I don't even know if it was a question. It was just part of the discussion maybe that would be something that we should consider . . . .
> Q. And do you remember what your response was? A. That I did not want to transfer to a different position.

As to Remmick moving to another position at Magellan as an accommodation for her disability, the record does not support her appellate claim. *See Hedlund v. Charlie Zook Motors, Inc.*, No. 13-CV-4058-DEO, 2014 WL 4794196, at *5-6 (N.D. Iowa Sept. 25, 2014) (recognizing plaintiff's unsupported allegations that accommodations may have allowed plaintiff to work are insufficient to create a genuine issue of fact in disability discrimination claim).

In any event, Remmick does not cite to any evidence showing a different position was available at Magellan, and Magellan "is not required to create a vacancy or otherwise create a job" for her. *Schlitzer*, 641 N.W.2d at 530. "Even if an employer fails to fully assist an employee in a request for reassignment, the employee must still show a specific position was available that he or she could have sought." *Blackford*, 661 N.W.2d at 521. "Without this showing, an employee cannot establish he or she is a qualified person." *Id.* "It is not enough for" Remmick "to make a general claim of the existence of the vacant position." *Id.* She "must specifically identify the position or positions that were available. It is only in the context of a particular job that the court can evaluate [her] qualifications to perform its essential functions." *Id.* Here, Remmick failed to show there was an open position at Magellan for which she was qualified.

We conclude Remmick "is not qualified" to perform the essential functions of her job with or without accommodation and thus "cannot make a prima facie case of disability discrimination." *Goodpaster*, 849 N.W.2d at 14.

## IV. Hostile Work Environment by Disability Harassment

Remmick also asserted an ICRA hostile-work-environment claim based on disability harassment. While the Iowa Supreme Court has not specifically addressed a hostile environment in the context of disability harassment, the standard for proving such a claim has been set out as to sexual harassment, racial harassment, and religious harassment. *See Haskenhoff v. Homeland Energy Sols., L.L.C.*, 897 N.W.2d 553, 571 (Iowa 2017) (stating, in context of sexual harassment, federal law is instructive because "the ICRA hostile-work-environment claim is modeled after its Title VII counterpart"); *Simon Seeding &*

*Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 468 (Iowa 2017) (racial harassment); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 632 (Iowa 1990) (religious harassment). For a prima facie case, Remmick is required to show: "(1) [she] belongs to a protected group; (2) [she] was subjected to unwelcome [disability] harassment; (3) the harassment was based on [her disability]; and (4) the harassment affected a term, condition, or privilege of employment." *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746 (Iowa 2006) (citation omitted). A fifth element requires Remmick to show "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action" as to "both supervisor and coworker harassment under the ICRA." *Haskenhoff*, 897 N.W.2d at 572. We resolve her co-employee claim on the fourth element and her supervisor claim on the fifth element.

### A.    Non-supervisory Employees

We consider whether Remmick's proffered evidence created a jury question on whether a reasonable person could find she had been subjected to a work environment so hostile that "a term, condition, or privilege of [her] employment" was altered. *Lynch v. City of Des Moines*, 454 N.W.2d 827, 834 (Iowa 1990) (stating a "loss of a tangible job benefit is not required"); *see Simon*, 895 N.W.2d at 468 (stating harassment is "actionable [w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive" to "create an abusive working environment"). Remmick must prove (1) she "subjectively perceived" her co-employees conduct as abusive," which we presume, and (2) "a reasonable person would also find the conduct to be abusive or hostile"—the fighting issue here. *Simon*, 895 N.W.2d at

469 (citation omitted). In analyzing the objective determination, Iowa courts consider:

> (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with [her] job performance. [The] circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment.

*Id.* at 469-70 (recognizing a "series of individual episodes of inappropriate behavior eventually can amount to a hostile environment"). "Discriminatory comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger . . . sanctions." *Vaughn*, 459 N.W.2d at 633 (citation omitted) (stating "mere utterance" of a racial epithet "does not affect the terms, conditions or privileges of employment to a significant degree"). The fact finder resolves whether the workplace conditions are "continuous, severe, and pervasive enough" to amount to a violation of ICRA. *Id.* (concluding plaintiff alleged sufficient facts showing harassment and "interpretation of this constellation of events should be left to the finder of fact").

We turn to the "constellation of events" under the "reasonable person" objective test as to Remmick's co-workers. Magellan specializes in providing services for individuals with mental illnesses. Remmick's co-workers are licensed clinicians. Remmick's co-workers treated her differently after her first leave by not including her in lunches, breaks for cigarettes, and conversations. She observed unfriendly looks and eye-rolling. These behaviors led to her feeling isolated from her team members. One co-worker asked prying questions when Remmick disclosed her mental illness as the reason for her second leave.

In the second meeting, another co-worker yelled at Remmick. Finally, Remmick did not feel her team members welcomed her back warmly on September 6, 2014, and the co-worker who previously had yelled at her angrily slammed a file down on her desk and glared at her.

Like the district court and the ICRC, we conclude the actions Remmick describes are rude, unprofessional, and offensive, but even in the aggregate, the actions are not so severe or pervasive as is necessary to meet the demanding standard of "extreme conduct." Remmick was not subject to unwelcome physical touching or threats or name-calling. Her co-workers did not directly interfere with her job duties. *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744-45 (Iowa 2003) (holding "occasional unpleasant treatment" was not "severe or pervasive, and did not permeate" the work environment with "discriminatory intimidation, derision, and abuse" as a matter of law); *Wright v. Ross Holdings, LLC*, No. 14-1106, 2015 WL 1848534, at *5 (Iowa Ct. App. Apr. 22, 2015) (stating demanding standard for hostile work environment "requires extreme conduct rather than merely rude or unpleasant conduct" (citation omitted)). We affirm on this issue.[7]

### B.    Supervisor Liability

The ICRC found Carlson's behavior objectively harassing, and the district court did not. But we assume, without deciding, Remmick sufficiently proved the

---

[7] Remmick also asserts the district court erred in failing to consider the hostile instant messages about her sent between some of her co-workers and between Carlson and some of her co-workers as "objective evidence of a hostile work environment that validates [her] subjective belief of hostility." First, her subjective belief is presumed and not at issue. Second, even if we consider the messages, which were unknown to Remmick, the co-workers' actual conduct towards her is still only "occasional unpleasant treatment."

first four elements of supervisor harassment. The question on appeal is only whether Remmick raised a question of fact on her burden to prove Magellan "failed to take prompt and appropriate remedial action." *Lynch*, 454 N.W.2d at 834. The district court found summary judgment appropriate on this element; we agree with the court's apt analysis and affirm on this issue:

> [A]n employer is only liable for hostile environment harassment if it knew or should have known of the alleged harassment and failed to take prompt remedial action. *Vaughn*, 459 N.W.2d at 634. As pertaining to Ms. Carlson, Magellan did not know about her alleged conduct until Ms. Remmick's attorney sent a letter to Magellan on September 3, 2013. Magellan promptly investigated . . . and imposed discipline in the form of a "Final Written Warning." Magellan's response is very similar to that found to be appropriate in *Vaughn*, in which the employer investigated following the complaint and imposed a written reprimand on the supervisor. *Id.* There is no indication that the warning imposed on Ms. Carlson did not have the effect of correcting the alleged misconduct. In fact, Ms. Remmick only worked at Magellan one day following her complaint and not at all following imposition of the disciplinary action.

## V.      Retaliation

Remmick asserts a fact question exists because "a reasonable jury could conclude" Carlson's act of moving her to another area upon her return to work in 2013 "was punishment." Remmick contends the district court correctly cited the elements for a retaliation claim but erred in finding she did not suffer retaliation. The elements are (1) Remmick "engaged in protected activity," (2) Magellan "took adverse employment action against" Remmick, and (3) the adverse employment action is causally linked to Remmick's protected conduct. *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004).

Remmick does not address the fact her new assignment was revoked near the end of the day she returned to work. Similarly, she does not address

case law stating "minor changes in working conditions that only amount to an inconvenience cannot support discrimination." *Farmland Foods*, 672 N.W.2d at 742. We find no error in the district court's conclusion Remmick failed to prove she suffered an adverse employment action where: (1) Remmick's share of Polk County had to be covered in her absence and was reassigned while she was on leave; (2) Polk County was returned to Remmick on the day she returned to work; and (3) the minor and very temporary change in her caseload did not impact her pay, class, job department, and work duties. *See id.* ("[I]nternal transfers involving minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action." (citations omitted)). Accordingly, we affirm the district court's grant of summary judgment on Remmick's retaliation claim.

**AFFIRMED.**